FILED

2023 Mar-14  PM 01:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| KIMLI DANCY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   7:21-cv-01349-HNJ |
| | ) | |
| SOCIAL SECURITYADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

Plaintiff Kimli Dancy seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability, disability insurance, and supplemental security income benefits.  The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment. (Doc. 10).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at §§ 404.1520(c), 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00-114.02. *Id.* at §§ 404.1520(d), 416.920(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's

impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20

C.F.R. §§ 404.1512(b)(3), 416.912(b)(3), 404.1520(g), 416.920(g).   If the claimant can perform other work, the evaluator will not find the claimant disabled.   *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g).   If the claimant cannot perform other work, the evaluator will find the claimant disabled.   20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.   *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).   The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"   *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   Indeed, "an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'"   *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)).   Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.   "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. . . .   Substantial evidence . . . . is 'more than a mere scintilla,' . . . [and] means – and means only – 'such relevant evidence

4

as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Ms. Dancy, age 39 on her alleged disability onset date and age 44 at the time of the current ALJ's decision, filed applications for a period of disability, disability insurance, and supplemental security income benefits on April 8, 2016, alleging disability as of February 1, 2016. (Tr. 12, 25, 468-80).

The Commissioner initially denied Dancy's claims on May 3, 2016, and Dancy timely filed a request for hearing on June 3, 2016. (Tr. 145-68, 226-28). The Administrative Law Judge ("ALJ") held a hearing on March 14, 2018 (Tr. 107-44), and issued an opinion on June 22, 2018, denying Dancy's claim. (Tr. 169-84). Dancy appealed that decision (Tr. 280-82, 594-95), and on April 3, 2019, the Appeals Council remanded the claim to the ALJ to explain the weight he afforded the record medical opinions. (Tr. 188-91).

The same ALJ conducted a second hearing on February 26, 2020 (Tr. 63-102), and on May 28, 2020, he issued a second decision, again denying Dancy's claim. (Tr. 192-205). Dancy appealed that decision (Tr. 375-77, 454-55), and on October 2, 2020, the Appeals Council again remanded the claim, as the ALJ evaluated the record medical

5

opinions pursuant to the post-March-2017 regulatory revisions, though Dancy filed her claim prior to March 2017.   (Tr. 211-16).

The Commissioner assigned the claim to a different ALJ, who held a third hearing on April 13, 2021 (Tr. 35-62), and issued a third decision on May 6, 2021, again denying Dancy's claim.   (Tr. 12-27).   This opinion addresses the ALJ's May 6, 2021, decision.

Applying the five-step sequential process, the ALJ found at step one that Dancy did not engage in substantial gainful activity after February 1, 2016, her alleged onset date.   (Tr. 18).   At step two, the ALJ found Dancy exhibited the severe impairments of lumbar strain, lumbar degenerative changes, and obesity.   (*Id.*).   At step three, the ALJ found that Dancy's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (Tr. 19).

Next, the ALJ found that Dancy exhibited the residual functional capacity ("RFC")

> to perform a range of light exertion as that term is described in the Administration's regulations; however, as a part of the job requirement, the claimant can stand or walk in combination for no more than three hours in an eight-hour day and cannot perform either of those postural activities more than one hour at a time.   The claimant has the ability to sit for eight hours.   The claimant can occasionally push or pull, operate foot controls, climb, balance, stoop, kneel, crouch, operate motor vehicles, or perform around hazardous machinery.   The claimant will not

be required to crawl or perform at unprotected heights.   The claimant will use a cane for ambulation.

(Tr. 20).

At step four, the ALJ determined Dancy could not perform her past relevant work as a security guard, cashier/checker, or parking lot attendant.   (Tr. 24-25).   At step five, the ALJ determined Dancy could perform a significant number of other jobs in the national economy considering her age, education, work experience, and RFC. (Tr. 25).   Accordingly, the ALJ determined Dancy has not suffered a disability, as defined by the Social Security Act, since February 1, 2016.   (Tr. 26).

Dancy timely requested review of the ALJ's decision.   (Tr. 466-67, 638-41).   On August 24, 2021, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision.   (Tr. 1-3).   On October 11, 2021, Dancy filed her complaint with the court seeking review of the ALJ's decision.   (Doc. 1).

## ANALYSIS

In this appeal, Dancy argues the ALJ improperly considered the opinions of the treating nurse practitioner, failed to provide evidentiary support for the residual functional capacity assessment, and failed to fully and fairly develop the administrative record by forsaking updated imaging and further consideration by the consultative examiner.   For the reasons stated herein, the court finds those contentions do not warrant reversal.

7

# I.     The ALJ Properly Considered the Treating Nurse Practitioner's Opinion

Dancy argues the ALJ improperly considered the opinions of Bobbie Curtis, a nurse practitioner and Dancy's treating provider.   As discussed below, that contention does not withstand analysis.

Under the previous regulatory framework applicable to Dancy's claim,[2] the ALJ must give "substantial or considerable weight" to the opinion of a treating physician "unless 'good cause' is shown." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).   Good cause exists when: (1) the evidence did not bolster the treating physician's opinion; (2) the evidence supported a contrary finding; or (3) a treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.   *Id.* at 1241.   An ALJ must clearly articulate the reasons for affording less weight to a treating physician's opinions.   *Id.* An ALJ does not commit reversible error when (1) he articulates specific reasons for declining to give the treating physician's opinion controlling weight, and (2) substantial evidence supports these findings.   *Moore*, 405 F.3d at 1212.

Moreover, to determine the weight given to any medical opinion, an ALJ must consider several factors, including the examining relationship, the treatment

---

[2] On January 18, 2017, the Commissioner revised the regulations governing the assessment of medical opinion evidence for claims filed on or after March 27, 2017.   *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404.1520c, 416.920c).   Dancy's claims, filed on April 8, 2016, do not fall under the revised regulations.

relationship, the evidence presented to support the opinion, the consistency of the opinion with other evidence, and the specialization of the medical professional. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see Davis v. Comm'r of Soc. Sec.*, 449 F. App'x 828, 832 (11th Cir. 2011) (stating that the ALJ will give more weight to the medical opinions of a source who has examined the plaintiff, and opinions supported by medical signs and findings and consistent with the overall "record as a whole"). The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Hearn v. Comm'r of Soc. Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015) (citing *Bloodsworth*, 703 F.2d at 1240). However, the ALJ must "state with at least some measure of clarity the grounds for [a] decision." *Winschel*, 631 F.3d at 1179. This measure of clarity requires the ALJ to articulate the weight given to each medical opinion and the reason therefor. *Id.*

Bobbie Curtis, Dancy's treating nurse practitioner at the Greene County Hospital Physicians Clinic, completed a Medical Source Statement (Physical) form on September 19, 2019, registering several assessments of Dancy's functional capacity. Curtis opined Dancy could sit for one hour and stand or walk for one hour during an eight-hour period. She could constantly (67-100% of the time) lift and/or carry one to five pounds, but she could rarely (1-5% of the time) lift more than five pounds. She required an assistive device to ambulate even minimally. Dancy should avoid dust, fumes, gasses, temperature extremes, humidity, and other environmental pollutants. She could rarely push, pull, climb, balance, perform gross and fine manipulation, bend,

stoop, reach, operate motor vehicles, and work around hazardous machinery.   On average, her impairments or treatment would cause her to miss work more than three times a month.   Curtis identified chronic radiating back pain as the medical basis for the restrictions she imposed, and she declared objective medical findings confirmed her diagnoses.   (Tr. 888).

Curtis also completed a Clinical Assessment of Pain form on September 19, 2019.   She indicated Dancy experienced pain to such an extent as to distract her from adequate performance of daily activities.   Physical activity – such as walking, standing, bending, stooping, and waving of extremities – would increase Dancy's pain to a level that would require bed rest and/or medication.   Curtis expected Dancy to experience significant medication side effects that may limit her effectiveness performing work duties or everyday tasks.   Curtis did not circle either "yes" or "no" in response to the question, "Can this patient's medical condition reasonably be expected to produce the pain complained of?"   She indicated Dancy's pain would prevent her from maintaining attention, concentration, or pace for periods of at least two hours.   Dancy would need to sometimes take unscheduled breaks, in addition to normal breaks every two hours. Her symptoms would interfere with attention and concentration 25% or more of the time.   (Tr. 889).

Curtis completed a second Medical Source Statement (Physical) form on February 10, 2021.   She opined Dancy could sit for less than one hour and stand or

walk for less than one hour during an eight-hour period.  She could lift up to five pounds occasionally and up to one pound frequently.   She required an assistive device to ambulate even minimally.   She should avoid dust, fumes, gasses, temperature extremes, humidity, and other environmental pollutants.   She could rarely push, pull, climb, balance, perform gross and fine manipulation, bend, stoop, reach, operate motor vehicles, and work around hazardous machinery.   On average, her impairments or treatment would cause her to miss work more than three times a month.   The imposed limitations could normally be expected from the type and severity of Dancy's diagnoses. Curtis identified chronic back pain and right shoulder pain as the medical bases for the restrictions she imposed, and she declared objective medical findings confirmed the diagnoses.  (Tr. 990).

Curtis also completed a second Clinical Assessment of Pain form on February 10, 2021.   She indicated Dancy experienced profound and intractable pain that virtually incapacitated her.   Physical activity – such as walking, standing, bending, stooping, and waving of extremities – would greatly increase Dancy's pain to a level that would cause distraction from, or total abandonment of, tasks.   Curtis expected Dancy to experience significant medication side effects that may limit her effectiveness performing work duties or everyday tasks.   Curtis indicated Dancy's medical condition *could not* reasonably be expected to produce the pain of which she complained.   She stated Dancy's pain would prevent her from maintaining attention, concentration, or pace for

periods of at least two hours.  Dancy would need to sometimes take unscheduled breaks, in addition to normal breaks every two hours.  Her symptoms would interfere with attention and concentration 25% or more of the time.  (Tr. 991).

The ALJ assigned Curtis's assessment of extreme limitations little weight.  (Tr. 24).  The ALJ correctly noted that under the pre-March-2017 regulations governing this claim, "a nurse practitioner is not an 'acceptable medical source' for establishing the existence of a medically determinable impairment," though a nurse practitioner may "provide evidence to show the severity of an impairment and how it affects an individual's ability to function."  (*Id.*).  Another district court summarized the distinction between "acceptable" medical sources and "other sources" for these purposes:

> For claims filed before March 27, 2017, the Regulations governing evaluation of opinion evidence draw a distinction between "acceptable" medical sources and "other" sources. 20 C.F.R. § 404.1527(a)(1); SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).  Acceptable medical sources include licensed physicians and licensed or certified psychologists, whereas "other" sources include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. SSR 06-03p.  Only "acceptable" medical sources may establish the existence of a medically determinable impairment. SSR 06-03p.  And only "acceptable medical sources" can give medical opinions that may be entitled to significant or controlling weight. *Anteau v. Comm'r of Soc. Sec.*, 708 F. App'x 611, 613 (11th Cir. 2017).  But "other" sources . . . may show the severity of an individual's impairment and how it affects the individual's ability to function. SSR 06-03p.

*Robinson v. Commissioner of Social Security,* No. 6:20-CV-1031-DNF, 2021 WL 3701558, at

*5 (M.D. Fla. Aug. 20, 2021) (footnote omitted).   Thus,

> [a]lthough there is a distinction between what an adjudicator must
> consider and what the adjudicator must explain in the disability
> determination or decision, the adjudicator generally should explain the
> weight given the opinions from these "other sources," or otherwise ensure
> that the discussion of the evidence in the determination or decision allows
> a claimant or subsequent reviewer to follow the adjudicator's reasoning,
> when such opinions may have an effect on the outcome of the case.

SSR 06-3p, 2006 WL 2329939, at *6.[3]

The ALJ followed those requirements when considering Curtis's assessments.

Even though the regulations do not require the ALJ to afford the assessments any

particular weight, he articulated that he afforded them little weight.   He explained that

he did so because the assessments were "not consistent with the objective diagnostic

imaging, improvement in physical therapy, or the claimant's statements such as daily

walking for exercise . . . and serving as primary caregiver for her mother after her

mother's leg amputation . . . ."   (Tr. 24).   He also stated:

> A predominant statement in the treatment records from Nurse
> Practitioner Curtis is a "general ill feeling" along with complaints of pain
> . . . .   The claimant was recommended dietary modification and an
> exercise regimen after her periods of physical therapy, but her weight was
> not reduced.   Ms. Curtis engaged in longitudinal treatment of the

---

[3] The agency rescinded SSR 06-03p effective March 27, 2017.   However, because the claimant filed
for disability in 2016, the ruling in effect at that time governs the analysis. SSR 96-2P, 2017 WL
3928298, at *2 ("The final rules revised these policies for claims filed on or after March 27, 2017, in
several ways. For example, in claims filed on or after March 27, 2017, the final rules state that all
medical sources, not just acceptable medical sources, can make evidence that we categorize and
consider as medical opinions.").

claimant with opiate analgesics, with the consent of various physicians. However, her assessment of the claimant's functional limitations is extreme, is not consistent with her or the other medical records, and is unsupported by the evidence in its entirety, including various statements regarding the claimant's actual activities, and the absence of any medical restriction of her functioning, even though these activities are not shown to be on a continuous basis.

(*Id*.).   Those factors all constituted permissible considerations.   *See* SSR 06-3p, 2006 WL 2329939, at *4-5 (the weight accorded evidence from other sources will vary according to the particular facts of the case; the source of the opinion, including that source's qualifications; the opinion subject matter; the length of the relationship; and other factors).

Moreover, substantial evidence supported the ALJ's decision.   Curtis's own treatment notes reflect Dancy consistently reported a general ill feeling and chronic pain in both her knee and her back.   (Tr. 747-86, 845-77, 950-89, 992-1016).   On May 11, 2017, she characterized her pain as moderate but worsening, and she stated physical therapy had not helped in the past.   (Tr. 770-71).   On one occasion – December 6, 2017 – she characterized her pain as mild.   (Tr. 756).   Otherwise, she continued to characterize her pain as moderate on June 12, July 12, August 9, September 5, October 7, and November 6, 2017; January 5, February 5, March 5, April 5, May 4, June 4, July 7, September 10, October 9, November 5, and December 4, 2018; January 2, February 7, March 11, April 12, May 9, June 12, July 12, August 19, September 19, November 25, and December 26, 2019; and January 24, February 27, June 23, July 29, October 15,

November 12, and December 30, 2020; and February 10 and March 10, 2021.   (Tr. 748-55, 758-73, 781-86, 846-73, 951-89).

On November 6, 2017, Dancy reported her back pain radiated into her right leg, and she demonstrated decreased range of motion in her lower extremity.   (Tr. 758-59). On February 5, 2018, she displayed normal range of motion and strength in her lower extremities.   (Tr. 752-53).   On multiple occasions, Dancy reported she could not see a specialist because she lacked medical insurance.   (Tr. 956, 960, 998, 1004).   On March 10, 2021, Curtis advised Dancy to apply for Medicaid benefits via the Health Department, and Dancy agreed to do so.   (Tr. 998).   Dancy consistently reported that physical therapy did not help her pain, and Curtis consistently prescribed Norco for pain management and recommended weight management and exercise.   (Tr. 748-55, 758-73, 846-73, 951-89).   On March 5 and October 9, 2018, Dancy reported Norco helped her function better with her daily activities.   (Tr. 786, 861).

Curtis appears to have based her treatment of Dancy primarily, if not solely, upon Dancy's subjective complaints of pain, yet she never characterized Dancy's pain as more than moderate in severity, and she never imposed any restrictions on Dancy's functioning.   To the contrary, she encouraged Dancy to exercise.   Moreover, as emphasized previously Curtis registered on the February 10, 2021, form that she would not reasonably expect Dancy's medical condition to produce the pain level reported by Dancy.   That notation garners significant weight, as it indicates even Curtis did not

find Dancy's complaints consistent with the medical evidence.  Thus, Curtis's own treatment notes do not provide a substantial evidentiary basis for her assessments of disabling limitations.

The other medical evidence also does not substantially support Curtis's assessments.

On February 18, 2016, Dancy presented to the Emergency Department at Greene County Health System after she fell from a ladder.  She reported constant, aching low back pain at a level eight, but the level decreased to four after she received pain medication.  During the physical examination, Dancy ambulated without difficulty, moved her extremities without difficulty, and displayed intact motor function. An x-ray revealed superior endplate compression fractures at L1 and L2.  The Emergency Department discharged Dancy the same day in stable condition, with a referral to an orthopedist.  (Tr. 663-72).

Dancy attended physical therapy beginning February 25, 2016.  She reported level-six pain which moderately affected her functioning.  She demonstrated 4/5 motor strength in the lower extremities, 3/5 motor strength in the core/trunk, and limited ability to bend and touch her toes.  (Tr. 654-57).  By March 14, 2016, and again on March 28, 2016, her pain level reduced to two, though her extremity muscle strength remained slightly limited at level 4+/5.  (Tr. 658-59).

After her fall – but before she began seeing Curtis at Greene County Hospital

Physicians Clinic – Dancy received treatment from Whatley Health Services.   On June 16, 2016, she reported feeling better after her fall due to physical therapy, yet she still experienced pain when lifting or sitting and standing for long periods.   Over-the-counter medication helped some.   She experienced no gait disturbance or muscle weakness.   Lumbar spine tenderness constituted the only symptom on the musculoskeletal examination.   Lisa Means, a Physician's Assistant, recommended Dancy continue exercising, take pain medications as needed, use ice and heat as needed, and lose weight.   (Tr. 733-37).

On July 18, 2016, Dancy displayed lumbar tenderness with pain radiating to the left hip, and the examination revealed mild pain with motion.   Sarah Pate, a Nurse Practitioner, recommended over-the-counter medication, ice, stretching, exercise, and weight loss.   Contrastingly, Dancy reported level-zero pain.   (Tr. 728-32).

On August 29, 2016, Dancy reported experiencing some back pain since her last visit, yet the pain had improved, as rest, ice, and over-the-counter medications helped. She assessed the pain at a level three, and she displayed normal gait.   (Tr. 723-27).

On November 29, 2016, Dancy reported on-and-off back pain at a level three. Over-the-counter medication did not help as much as in the past, and she requested other pain medication.   (Tr. 718-22).

On February 7, 2017, Dancy reported continued pain at a level two.   She experienced difficulty walking, standing, or sitting for extended periods of time.   She

displayed mild pain with motion in the lumbar spine.   (Tr. 713-17).

On February 9, 2017, a lumbar spine x-ray revealed: "slight loss of height of the superior endplate of the L3 vertebral body and defect along the anterior superior margins of the vertebral body[, which] could be related to post-traumatic or developmental changes.   The findings appear relatively chronic.   Mild lumbosacral arthritic changes."   (Tr. 700).

On March 30, 2017, she presented for a gynecological examination, and the records do not contain findings about her back pain.   (Tr. 708-12).

On April 24, 2017, Dancy reported level seven pain with some radiation to the left side and difficulty standing, walking, or sitting for long periods.   Her medications helped minimally.   The examination produced mild pain with her back's range of motion, but Dancy displayed normal gait.   She received an orthopedic referral.   (Tr. 702-07).

Dancy returned to physical therapy on October 10, 2017, as she experienced a decline in her tolerance for functional activity.   She reported level-five pain, and she displayed 4-/5 muscle strength in her lower extremities.   (Tr. 815-17).   On October 16, 18, 23, and 25, 2017, she completed her exercises with minimal pain reported.   (Tr. 827-28).   On October 30, 2017, she reported level-six pain, but she demonstrated improved ability to sit upright while maintaining posture.   (Tr. 818).   By November 7, 2017, her pain had decreased to level three, and her ability to sit upright continued to

improve.   (Tr. 819).   On November 6 and 8, 2017, she completed her exercises with good tolerance and minimal pain.   (Tr. 830).   On November 16 and 28, 2017, Dancy reported level-five pain.   (Tr. 822-23, 831).

On September 15, 2018, Dancy presented to the Emergency Department at Greene County Health System with complaints of arm and facial swelling, but she denied back pain, and she ambulated without difficulty.   (Tr. 805, 814).

On April 29, 2019, she presented to the Emergency Department at DCH Health System with complaints of throat, eye, and abdominal pain.   The physical examination of her back produced normal results and no tenderness.   (Tr. 933-35).

On December 29, 2019, she presented to the Emergency Department at DCH Health System with complaints of back pain.   (Tr. 891-918).   She characterized her pain at a level ten of ten, and the pain had decreased to a level eight when she discharged.   (Tr. 897, 903).   She displayed stable gait, good lower extremity strength, and intact sensation in lower extremities.   (Tr. 909).

These records indicate Dancy experienced chronic back pain after her fall in 2016, yet, with only a few sporadic exceptions, even her subjective reports characterized the pain as no more than moderate, and medication provided good pain control. Physical findings – including typically normal gait, little to no difficulty ambulating, above average motor strength, intact sensation, and mild pain with motion in the lumbar spine – comport with her complaints of mostly moderate pain.   Accordingly,

19

the other medical records do not provide substantial support for Curtis's imposition of disabling limitations.

Dancy argues the ALJ impermissibly focused on isolated facts to support the finding of non-disability while ignoring other facts that would support a disability finding.   Specifically, Dancy argues the ALJ improperly considered her statements that Norco improved her daily functioning, as she previously engaged in only extremely limited activities, and an increase in those activities still would not support an ability to work on a sustained basis.   (Tr. 23).   She also argues the ALJ improperly considered her August 23, 2019, statement to Emergency Department providers that she served as her mother's primary caregiver after her mother underwent a leg amputation, and her September 10, 2020, statement that she hurt her shoulder taking care of a 19-pound baby.   (Tr. 883, 971).   Although Dancy does not dispute she rendered the foregoing statements as recounted by the ALJ, she disputes the extent of her caregiver role and the ALJ's characterization of her shoulder injury.   Regardless of the ALJ's assessment of that evidence, he did not focus solely on those three facts to support his decision. As discussed in detail above, neither Curtis's own records nor the remainder of the medical evidence supports Curtis's extreme assessments.

For these reasons, the court finds the ALJ did not err in evaluating Curtis's assessments of disabling limitations.

## II.     The ALJ Properly Assessed Dancy's Residual Functional Capacity

Dancy next argues the ALJ erred by reaching a more restrictive RFC finding than the ALJ formerly assigned to the case, without providing an adequate evidentiary foundation for the differences.   Assessing a claimant's RFC lies within the exclusive province of the ALJ.   *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("[T]he final responsibility for deciding [a claimant's RFC] is reserved to the Commissioner."); 20 C.F.R. §§ 404.1546(c), 416.946(c) ("[T]he administrative law judge . . . is responsible for assessing [a claimant's] residual functional capacity."); *Oates v. Berryhill*, No. 17-0130-MU, 2018 WL 1579475, at *8 (S.D. Ala. Mar. 30, 2018) ("The responsibility for making the residual functional capacity determination rests with the ALJ.").

In the May 28, 2020, administrative opinion, the previous ALJ found Dancy possessed the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except occasional stooping and crouching; no climbing of ladders, stairs, ramps, or scaffolds; no unprotected heights; no operation of hazardous machinery; no driving; no lower extremity pushing and pulling; and could use an assistive device (cane) for ambulation and balancing.

(Tr. 200).

Dancy contends the current RFC "is starkly different" from the former RFC, as the current ALJ "increased her overall exertional level from sedentary to light; removed the inability to climb, push or pull, operate foot controls, and work around hazardous

machinery, allowing such activity on an occasional basis; and implicitly removed the requirement to use a cane for balance." (Doc. 11, at 15). Given those differences, Dancy faults the ALJ's decision on appeal at bar for failing to "identify any evidence of medical improvement." (*Id*).

However, there exists no requirement the ALJ explain the distinctions between his RFC finding and the previous ALJ's finding. The Appeals Council vacated the previous ALJ's decision pursuant to 20 C.F.R. §§ 404.977 & 416.1477, and it remanded the case for review by a different ALJ. (Tr. 213). According to the Administration's Hearing, Appeals, and Litigation Law Manual (HALLEX), such an action "requires that an ALJ issue a new decision in the case." HALLEX § I-3-7-1, 1993 WL 643162 (April 26, 2016); *see Prevost v. Comm'r of Soc. Sec.*, No. CV 20-11961, 2021 WL 2349348, at *4 (E.D. Mich. Mar. 31, 2021), *report and recommendation adopted sub nom. Prevost v. Saul*, No. 20-CV-11961, 2021 WL 1940487 (E.D. Mich. May 14, 2021) (citing HALLEX § I-3-7-1) ("The Appeals Council's February 2019 remand order effectively nullified ALJ Blatnik's 2018 decision. . . . Given that the prior decision is typically vacated 'in its entirety,' it makes sense that the HALLEX does not direct the ALJ to explain any differences between his original decision and the one issued after remand.").

In the same tenor of the afore-discussed RFC contentions, Dancy asserts the ALJ failed to link the RFC finding to medical assessments in the record. (Doc. 11, at 15); *see also id.* at 17 (The ALJ "failed to link the evidence to the RFC determination by

describing how the evidence supports each conclusion."). As an initial matter, that the current ALJ's RFC finding departs from Curtis's assessment does not evince an erroneous determination. As previously discussed, the ALJ properly afforded Curtis's assessment little weight, and substantial evidence supported his decision to do so.

Furthermore, Social Security Ruling 96-8p dictates that an RFC assessment must first determine the claimant's functional limitations and then address the claimant's ability to work on a function-by-function basis, pursuant to the functions described in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. SSR 96-8p, 1996 WL 374184, *1. Those functions include physical abilities such as standing, walking, lifting, carrying, pushing, and pulling; mental abilities such as understanding and carrying out directions, responding appropriately to coworkers and supervision, and handling work pressures; and other abilities such as vision or hearing impairments, or environmental restrictions. 20 C.F.R. §§ 404.1545, 416.945.

The ALJ does not need to enumerate every piece of evidence or function used in his or her determination, but rather must simply portray that he or she considered the claimant's medical conditions in totality. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009). Once the ALJ has conducted that determination, the ALJ may then express the RFC in terms of exertional levels such as sedentary, light, medium, heavy, and very heavy. SSR 96-8p, 1996 WL 374184, at *1; *see Castel*, 355 F. App'x at 263; *Freeman v. Barnhart*, 220

F. App'x 957, 959 (11ᵗʰ Cir. 2007); *see also Bailey v. Astrue*, No. 5:11-CV-3583-LSC, 2013 WL 531075, *6 (N.D. Ala. Feb.11, 2013).

The ALJ performed such an analysis here, and he reached an RFC finding supported by the substantial evidence summarized in the previous section.   As such, he did not engage in mere speculation, contrary to Dancy's argument.

That finding encompasses the ALJ's assessments that Dancy can stand and walk for three combined hours during an eight-hour day and lift and carry up to twenty pounds up to one-third of the workday.[4]   Dancy argues those assessments constitute mere speculation, and they contradict the ALJ's stated requirement she will need to use a cane for ambulation.   (Doc. 11, at 16 ("The ALJ failed to explain how an individual who is required to use a cane for ambulation could be expected to stand and walk for three hours in an eight-hour workday, or how an individual who is required to use a cane for ambulation could be expected to lift and carry up to twenty pounds up to one-third of the work-day.")).

The ALJ's assessments do not amount to speculation.   The ALJ limited Dancy to using a cane, even though Dr. Walid Freij, the consultative examiner, stated she did not need a cane.   (Tr. 697).   The ALJ reasoned that "later evidence show[ing] ongoing

---

[4] The ALJ did not impart any specific statements about Dancy's ability to lift and carry, but he found she could perform light work, and light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b).

treatment with opiates, continued obesity, and at times an antalgic gait" reasonably justified cane usage, and he imposed "somewhat greater limitations in standing and walking" as a result.   (Tr. 23).   Indeed, Dr. Freij opined Dancy could stand for a total of three hours and walk for a total of three hours during a workday, meaning she could engage in those two activities for a combined total of six hours each day.   In contrast, the ALJ limited Dancy to standing and walking *in combination* for a total of three hours each day, or half the amount of time Dr. Freij assessed.   (Tr. 20).   Accordingly, the ALJ adequately explained the standing, walking, and limitations in his RFC finding, and he linked those findings to specific medical evidence – i.e., Dancy's continued opiate treatment, continued obesity, and occasionally antalgic gait.

Moreover, the ALJ's assessment that Dancy needs a cane to ambulate does not necessarily conflict with the ALJ's finding that Dancy can perform a limited range of light work.   Social Security regulations recognize that use of a cane or other hand-held assistive device may limit the use of the upper extremities.   20 C.F.R. § Pt. 404, Subpt. P, App. 1(C)(6)(d) ("When you use a one-handed, hand-held assistive device (such as a cane) with one upper extremity to walk and you cannot use your other upper extremity for fine or gross movements (see 1.00E4), the need for the assistive device limits the use of both upper extremities.").   Even so, "courts have often found that persons are capable of light, and even medium, work despite the need for an assistive device like a cane." *Chambers v. Berryhill*, No. 1:16CV609-WC, 2017 WL 3381229, at *10 (M.D. Ala.

25

Aug. 4, 2017) (citing *Freeman v. Comm'r, Soc. Sec. Admin.*, 593 F. App'x 911, 916 (11th Cir. 2014)).   The assessment depends on a combination of all factors, including the claimant's specific abilities, work history, age, and educational background.   In the present case, the vocational expert (VE) testified that an individual of Dancy's background, and with the RFC the ALJ imposed – including cane usage for ambulation – could perform jobs existing in significant numbers in the national economy.   (Tr. 54-55).   The VE's testimony constituted substantial evidence to support the ALJ's decision about the number of jobs Dancy could perform in light of her RFC.   *Ross v. Comm'r, Soc. Sec. Admin.*, No. 21-13562, 2022 WL 3654820, at *2 (11th Cir. Aug. 25, 2022) (citing *Wilson v. Barnhart*, 284 F.3d 1219, 1228 (11th Cir. 2002)) ("[A] hypothetical question to a vocational expert can serve as substantial evidence to support a denial of disability benefits at step five only so long as it includes all of a claimant's impairments.").

For these reasons, the ALJ did not err in assessing Dancy's Residual Functional Capacity.

## III.   The ALJ Did Not Err By Failing to Recontact Dr. Freij, Order an Additional Consultative Examination, or Order Updated Imaging

In her third assignment of error, Dancy contends the ALJ erred by failing to recontact Dr. Freij, the consultative examiner, order an additional consultative examination, or order updated imaging.

Dr. Freij, a neurologist, conducted a disability examination on November 14, 2017.   Dancy reported experiencing lower back pain for one year after falling off a ladder.   She reported greater pain on the right side, and the pain radiates into her thighs and legs.   She also sometimes experiences pain and cold sensations in her toes and feet. Walking and standing worsen the pain, and working became progressively difficult such that she eventually quit doing so.   She reported Flexeril and Norco help her pain slightly.

During the examination, Dancy appeared to experience no acute distress.   Dr. Freij detected no swelling, redness, heat, or limited range of motion in any joint. Dancy's cervical spine displayed no restriction in lateral flexion, extension, or rotation. Her thoracolumbar spine demonstrated limited range of motion to 45 degrees, and her lumbosacral spine demonstrated lower back pain with straight leg raising 45 degrees bilaterally.   She did not use an assistive device.   She displayed an antalgic gait, but her motor strength registered as 5/5 throughout.

Dr. Freij assessed lower back pain with pain radiating to the lower extremities, especially while standing and walking, and he also suspected lumbosacral spinal stenosis. (Tr. 696-98).   He stated:

> Based on the above history and physical examination patient would not be able to do work related activities that would require her to stand or walk for prolonged periods of time.   She is not able to carry or lift objects heavier than 20 lbs.   She is able to sit, hear, and speak.   She can travel in moderation.

27

(Tr. 698).

Dr. Freij also completed a Medical Source Statement of Ability To Do Work Related Activities (Physical) form on November 14, 2017.   He indicated Dancy could frequently (1/3 to 2/3 of the time) lift and carry up to ten pounds, occasionally lift and carry up to 20 pounds, and never lift or carry more than 20 pounds.   He imposed those limitations due to Dancy's lower back pain radiating into her lower extremities.   Dr. Freij indicated Dancy could sit eight hours continuously without interruption, and for a total of eight hours in an eight-hour workday.   She could stand for one hour at a time, and for a total of three hours in an eight-hour workday.   She could walk for one hour at a time, and for a total of three hours in an eight-hour workday.   She did not need a cane to ambulate.   She could continuously (over 2/3 of the time) reach, handle, finger, and feel; occasionally (up to 1/3 of the time) push and pull; and occasionally operate foot controls.   She could occasionally climb, balance, stoop, kneel, and crouch, but she could never crawl.   She suffered no hearing or vision impairments.   She could never work around unprotected heights, but she could occasionally operate a motor vehicle and work around moving mechanical parts, humidity, pulmonary irritants, extreme heat and cold, and vibrations.   She could tolerate exposure to loud noises like heavy traffic. She could shop; travel without a companion; ambulate without a wheelchair, walker, two canes, or two crutches; walk a block at a reasonable pace on rough or uneven

28

surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed herself; care for her personal hygiene; and sort, handle, or use paper and files.   Dancy had experienced those limitations for a year, and Dr. Freij expected the limitations to last another year.   (Tr. 690-95).

The ALJ disagreed with Dr. Freij's assessment that Dancy did not need a cane, as "later evidence shows ongoing treatment with opiates, continued obesity, and at times an antalgic gait . . . ."   For those reasons, the ALJ found it "reasonable to provide for a cane used for ambulation, and the claimant testified she did so."   In addition, the ALJ imposed "somewhat greater limitations in standing and walking . . . in light of the later medical evidence."   Otherwise, the ALJ afforded Dr. Freij's opinion "good weight" as it "is the most specific, and is more consistent with the evidence in its entirety."   (Tr. 23).

As more than three years passed between Dr. Freij's assessment and the current ALJ's administrative opinion (November 14, 2017 to May 6, 2021), Dancy argues the ALJ should have either recontacted Dr. Freij for updated information or ordered another consultative examination.   She also argues the ALJ should have obtained updated objective imaging, as she last underwent a lumbar spine x-ray in February 2017, she experienced degenerative disc disease, a progressive condition, and she could not afford an MRI or other tests due to lack of medical insurance.   According to Dancy,

the ALJ's failure to undertake these tasks violated his duty to develop a full and fair record for appeal.

Dancy bears the burden of proving she is disabled, and therefore bears responsibility for producing evidence to support her claim. *Hethcox v. Comm'r of Soc. Sec.*, 638 F. App'x 833, 835 (11th Cir. 2015); 20 C.F.R. §§ 404.1512(a), 416.912(a). However, "[s]ince a hearing before an ALJ in a social security matter is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record," even if the claimant has counsel. *Tackett v. Comm'r of Soc. Sec.*, No. 21-11852, 2022 WL 2314095, at *4 (11th Cir. June 28, 2022) (citing *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007)).   Specifically, Social Security regulations require the ALJ to:

> develop [claimant's] complete medical history for at least the 12 months preceding the month in which [the claimant files her] application unless there is a reason to believe that development of an earlier period is necessary or unless [the claimant says her] disability began less than 12 months before [the claimant] filed [her] application.

20 C.F.R. §§ 404.1512(b)(1), 416.912(b)(1).

However, the ALJ's failure to fulfill his duty to fully develop the record only necessitates remand if "'the record reveals evidentiary gaps which result in unfairness or clear prejudice.'"  *Mosley v. Acting Comm'r of Soc. Sec. Admin.*, 633 F. App'x 739, 742 (11th Cir. 2015) (quoting *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995)).   Therefore, "when the evidence in the record is sufficient to support the ALJ's determination, the ALJ does not have a duty to obtain additional medical evidence."  *Lindsey v. Comm'r of*

*Soc. Sec.*, 741 F. App'x 705, 710 (11th Cir. 2018) (citing *Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999)).   Likewise, the ALJ need not order a consultative examination "'as long as the record contains sufficient evidence for the administrative law judge to make an informed decision.'"   *Tackett*, 2022 WL 2314095, at *4 (quoting *Ingram*, 496 F.3d at 1269).   The ALJ bears no responsibility to recontact medical sources when the record already contains substantial evidence to support a decision.   *Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010); *Davison v. Astrue*, 370 F. App'x 995, 998 (11th Cir. 2010).

If the passage of time caused a decline in Dancy's condition, she, not the Commissioner, bore the burden to prove the decline.   *Hethcox*, 638 F. App'x at 835; 20 C.F.R. §§ 404.1512(a), 416.912(a).   The ALJ accounted for some level of decline, as he observed Dancy could reasonably need a cane at the time of the administrative decision, though she did not need one at the time of Dr. Freij's examination.   The record includes updated treatment notes, but it does not contain any evidence reflecting additional decline, or the need to impose additional limitations.   Rather, the record medical evidence, as previously summarized, adequately supported the ALJ's decision. The ALJ did not need to obtain additional evidence, recontact Dr. Freij, or an order an additional consultative examination as the existing evidence sufficed.

As to Dancy's assertion she could not afford additional imaging tests, an ALJ should not draw a negative inference from the claimant's failure to seek additional

treatment when the claimant cannot afford such treatment. *Bellew v. Acting Com'r of Soc. Sec.*, 605 F. App'x 917, 921 (11th Cir. 2015) (citing *Dawkins v. Bowen,* 848 F.2d 1211, 1212-14 (11th Cir. 1988)) ("'[P]overty excuses noncompliance,' such that noncompliance does not prevent a claimant from receiving benefits where the noncompliance is a result of the claimant's inability to afford treatment.'").  Thus, "[w]hen the ALJ 'primarily if not exclusively' relies on a claimant's failure to seek treatment, but does not consider any good cause explanation for this failure, [the court should] remand for further consideration." *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1268 (11th Cir. 2015) (citing *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam); *Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 487 (11th Cir. 2012) (per curiam)).   "However, if the ALJ's determination is also based on other factors, such as RFC, age, educational background, work experience, or ability to work despite the alleged disability, then no reversible error exists."   *Henry*, 802 F.3d at 1268 (citing *Ellison*, 355 F.3d at 1275).

Here, even if the ALJ drew a negative inference from Dancy's failure to obtain additional medical imaging, that inference did not create a reversible error, as the ALJ did not rely primarily upon Dancy's failure to seek additional treatment in evaluating her symptoms, determining her residual functional capacity, and assessing the medical opinions.   Rather, as discussed, the ALJ considered the medical evidence portraying no more than moderate pain and relatively mild clinical findings, as well as Dr. Freij's

opinion.  Thus, the ALJ's RFC finding did not derive solely, or even primarily, from Dancy's failure to seek additional imaging; it primarily emanated from substantial evidence undermining the alleged severity of Dancy's back condition and the alleged scope of her limitations.  Accordingly, the ALJ's consideration of Dancy's imaging results does not manifest as error.  *See Green v. Soc. Sec. Admin., Comm'r*, 695 F. App'x 516, 522 (11th Cir. 2017) ("[E]ven if we agreed with [the claimant] that the ALJ drew an adverse inference from the fact that she had not sought specialized treatment for her fibromyalgia or back pain, [she] cannot show reversible error . . . [g]iven that the ALJ did not rely exclusively on [her] failure to seek specialized treatment when discrediting her testimony."); *Ybarra v. Comm'r of Soc. Sec.*, 658 F. App'x 538, 541 n.2 (11th Cir. 2016) (the ALJ improperly relied upon the claimant's deferral of treatment without considering his inability to afford the same; however, the ALJ's error did not warrant reversal because the ALJ buttressed the credibility assessment with other substantial evidence).

In summary, the ALJ properly considered Dr. Freij's opinion, and he did not err by failing to recontact Dr. Freij, order an additional consultative examination, or order updated imaging.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 14th day of March, 2023.

_____

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE